{¶ 1} This case is before the court on appeal from the judgment of the Lucas County Court of Common Pleas which, following a jury trial, found appellant, Jeremy J. Quinn, Jr., guilty of one count of kidnapping, in violation of R.C. 2905.01(A)(4), and six counts of rape, in violation of R.C. 2907.02(A)(2), each count a felony of the first degree, and sentenced him to ten years on each count, to be served consecutively, for a total *Page 2 
period of incarceration of 70 years.[1] On appeal, appellant raises the following assignments of error:
 {¶ 2} "Assignment of Error No. 1
 {¶ 3} "The verdicts were unsupported by sufficient evidence and against the manifest weight of the evidence.
 {¶ 4} "Assignment of Error No. 2
 {¶ 5} "The sentence imposed by the trial court was excessive and contrary to law when the sentence exceeded the minimum term of imprisonment on the basis of findings made by the trial judge pursuant to a facially unconstitutional statutory sentencing scheme.
 {¶ 6} "Assignment of Error No. 3
 {¶ 7} "Appellant was deprived of effective assistance of counsel.
 {¶ 8} "Assignment of Error No. 4
 {¶ 9} "Prosecutorial misconduct during the trial rendered appellant's trial fundamentally unfair and a new trial should be granted."
 {¶ 10} Appellant argues in his first assignment of error that his convictions were unsupported by sufficient evidence and against the manifest weight of the evidence. Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction of the offenses. As such, the issue to be determined with respect to a motion for acquittal is whether there was sufficient evidence *Page 3 
to support the conviction. Sufficiency of the evidence and manifest weight of the evidence are quantitatively and qualitatively different legal concepts. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 11} "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. In making this determination, an appellate court must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 12} When considering whether a judgment is against the manifest weight of the evidence in a bench trial, an appellate court will not reverse a conviction where the trial court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt. State v. Eskridge (1988), 38 Ohio St.3d 56, 59. The court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the court "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. Id. *Page 4 
 {¶ 13} Pursuant to R.C. 2905.01(A)(4), a person is guilty of kidnapping if he removes by force, threat, or deception, another from the place where the other person is found, or restrains the liberty of the other person, in order to engage in sexual activity, as defined in R.C. 2907.01,[2] with the victim against the victim's will. A person if guilty of the offense of rape, pursuant to R.C. 2907.02(A)(2), if he engages in "sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 14} In this case, the victim testified that, on July 18, 2005, she came home around noon after spending the night at a friend's house. She took a shower and began to get ready for work around 3:00 p.m. She had to be to work at 4:30 p.m. and left her house between 4:10 p.m. and 4:15 p.m. She got into her 2000 Plymouth Neon, which was parked in her driveway, when she heard someone speak. She turned around and saw a black male, whom she did not know and had never met, coming into her car. The victim identified appellant as the person who entered her car. She testified that appellant came up to her car with a skinny silver knife, like a butterfly knife, and told her to get *Page 5 
down. She screamed and appellant told her to stop or he would kill her. He put her head under the dashboard and put her legs up on the passenger's seat. The victim testified that appellant drove for three to five minutes, but she could not see anything from her position under the dashboard.
 {¶ 15} When appellant stopped the vehicle, he told the victim to get in the back seat, where he joined her. After going through her purse, he told her to take off her clothes. She testified that appellant cut the strap of her shirt with his knife. She testified that appellant was wearing a black tee shirt and navy blue shorts. She also testified that he had scratches on his lower arm and a tattoo of a dog on his chest that said, "Fear or feel me." The victim stated that, while in the car, appellant made her put his penis in her mouth, and he put his penis in her vagina and anus. Appellant then made the victim exit the car, where he put his penis into her vagina two more times and again into her anus. Once outside the car, the victim could only see trees and a gray roof of a nearby building. Appellant then put the victim back into the car where he proceeded to masturbate. Appellant made the victim swallow his ejaculate.
 {¶ 16} The victim also testified that appellant made her kiss him, that he sucked her breasts and licked her vaginal area. She put clothing back on, but had to wear pants from her trunk because she was unable to get her jeans back on due to her sweating. Appellant drove the victim, who was again under the dashboard, to a driveway around the corner from her house. He wiped down the steering wheel and the interior of the vehicle and left, after telling the victim "not to hate black people, because not all black people are *Page 6 
the same, not all black people do this to people." The victim drove home. The victim was 16 years old in December 2005, at the time of the trial.
 {¶ 17} When she arrived home, her neighbors Andrew and Karen Shilling were outside. Karen asked the victim if she had run into Andrew's car. The victim said that appellant had hit Andrew's car, that he raped her, and that he was probably watching her. Ms. Shilling took the victim into her garage and called 911. The victim described appellant to the 911 operator and police arrived on the scene. Before going to the hospital, while still at the Shilling's home, the victim testified that she was shown a photo array. She testified that she did not identify appellant immediately because his hair had been in corn rows when she saw him, but he was not pictured that way. Nevertheless, she identified appellant as the perpetrator. The victim did not recall seeing a photo array while she was at the hospital.
 {¶ 18} Karen Shilling testified that she had gone out around 4:15 p.m., on July 18, 2005, to get the mail and saw "a black male riding a bike very slowly past and he was staring at me, and I did look at him, but not for long, so I can't identify him." She, however, described his bicycle as being dark in color and stated that the male's hair was "close to his head." Ms. Shilling testified that she never saw him before and "just kind of got a funny feeling it just wasn't right," but only got the mail and went back in the house. About an hour later, approximately 5:15 p.m., she and her son Andrew were leaving the house and she noticed that his car, which was parked in the street, had been hit. She then saw the victim walking over from between the cars in her driveway, looking "very *Page 7 
nervous, very scared." Ms. Shilling asked the victim if she had hit the car and she said, "no, he did it * * * he raped me." She described the victim as "absolutely terrified, panicked," and stated that the victim "flipped out and said no, you can't call 911. He said he would kill my family and he'll kill me and now he's going to kill you also." Ms. Shilling called 911 and the police came immediately. Ms. Shilling stayed about 20 minutes and left once the victim's siblings were there to comfort her. She also testified that she had not heard any collision with the cars, but noted that she had the air conditioning on in the house that day. Ms. Shilling stated that she had identified the bicycle, upon which she had seen a black male riding, for Detective Robert Cowell.[3]
 {¶ 19} Sergeant Clarence Whalen with the Sylvania Township Police Department testified that he questioned the victim at the Shilling's house. He stated that the victim described scratches on the perpetrator's right forearm and a dog tattoo with "fear me" or "feel me." Whalen told dispatch the additional identifying information and retrieved a photograph from his vehicle. He testified that the victim identified appellant as the perpetrator. About 20 minutes later, after the victim left for the hospital, Whalen met with sheriffs deputies at appellant's address on Dorr Street. Appellant's address on Dorr Street was approximately one mile from the victim's home. Appellant was being held in custody in the backseat of a patrol car and was taken to the police station. En route to the station, Whalen stopped back at the victim's residence to retrieve a bicycle that had been found next to her house. *Page 8 
 {¶ 20} Deputy Sheriff Christopher Gonia testified that he went to appellant's address on Dorr Street and informed appellant's father that appellant was a suspect in a rape that had just occurred off of Bancroft Street. Appellant came downstairs wearing nothing but denim shorts, which he was fastening closed. Gonia testified that appellant had a tattoo of a dog with some writing on his chest. After speaking with appellant, Gonia notified him he would be taken to the police station for further questioning. Appellant requested shoes. Gonia and appellant's father went up to appellant's room where Gonia saw navy colored shorts and several black tee shirts on the bed. Gonia took possession of the items of clothing since the perpetrator had been described as wearing navy shorts and a black tee shirt. Gonia testified that the clothing was wet. When Gonia returned downstairs with the clothing, appellant became irate and stated that the clothes could not be taken without a search warrant. Appellant was then placed in a patrol vehicle.
 {¶ 21} Detective Robert Cowell with the Sylvania Township Police Department testified that he prepared a photo array including appellant's picture around 6:15 p.m. and showed the victim the array at the hospital. He testified that she immediately identified appellant as the man who had raped her. Approximately 11:00 p.m., Cowell executed a search warrant for appellant's parent's home to attempt to recover appellant's underpants and the knife used to threaten the victim. The underpants were not recovered. Cowell testified that Deputy Gonia indicated that the condition of the room had been changed and that items were put away that had been out earlier that day. A knife matching the *Page 9 
description provided by the victim was found in appellant's father's pocket. Appellant's father had initially denied having such a knife, but the knife was found on his person during a pat down search.
 {¶ 22} Cowell interviewed appellant after he was placed under arrest. When informed he was under arrest for rape and kidnapping, appellant responded, "If you ain't got the DNA, * * * you ain't got nothing * * * ." Regarding his whereabouts at 4:00-4:15 p.m., appellant told Cowell he was at a video store and at home during the day, but never indicated where he was around 4:00 p.m., and never stated that he had been with the victim. Cowell further testified that appellant had scratches on his forearm and a tattoo of a dog that said, "Fear or feel me."
 {¶ 23} Approximately three days after the incident, Cowell drove the victim around the vicinity of the crime scene, but, after two hours, the victim could not find the location. Cowell testified that in the vicinity of the victim's home, there were numerous wooded areas and gray buildings like those described by the victim.
 {¶ 24} On cross-examination, Cowell testified that no latent fingerprints were found in the Neon or on the bicycle. Cowell also testified that the victim selected the knife seized at appellant's address out of five knives, indicating that it was the most similar to the knife the suspect used. Regarding appellant's whereabouts, Cowell testified that he did not follow up with the video store because it "[d]idn't matter much to [him] if [appellant] was buying videos at 12:00 that day," when the crime occurred after 4:00 p.m. *Page 10 
 {¶ 25} Raquel Ruiz, R.N., a sexual assault nurse examiner, went to Flower Hospital on July 18, 2005 to conduct a sexual assault examination on the victim. Ruiz testified that the victim had a bruise on her neck, where the victim indicated appellant had sucked her neck, puncture wounds to both palms, a bruise on her upper medial inner thigh, a scratch on her left medial knee, abrasions on both her back and her scapula region, three skin tears along her anus, and dirt and debris in her vaginal vault and perineum area.
 {¶ 26} Linsey Windau, a forensic scientist in the serology DNA section of the Ohio Bureau of Criminal Identification and Investigation, testified that she performed serological tests on the sexual assault evidence collected from the victim. Windau testified that seminal fluid was found on the vaginal swabs and panties, and Amylase, which is a component of saliva, was found on the panties, and on the swabs of the breast and neck. Windau conducted DNA analysis of the fluids found and the DNA standards of the victim and appellant, finding the following:
 {¶ 27} "For the stain on the crotch of the underwear in the non-sperm fraction there was a mixture of the profiles that were generated that were consistent with being a mixture from [the victim] — she was major contributor — and [appellant] was the minor contributor. On the sperm fraction of that same stain there was a mixture of [appellant] being the major contributor, and [the victim] and unknown individual, and [the victim] and the unknown individual being minor contributors. *Page 11 
 {¶ 28} "On the breast dried stain swab there was a mixture of [appellant], who is the major contributor, and [the victim] the minor contributor, and on the neck dried stain swab a mixture of [the victim] being a major contributor, [appellant] and an unknown individual both being minor contributors."
 {¶ 29} Windau testified on cross-examination that she did not test the vaginal swab because she received a stronger indicator from the stain on the panties. She also testified that she did not know whether the unknown person, whose DNA was also present, was male or female.
 {¶ 30} Appellant testified in his own defense that he had been released from prison in Marion, Ohio, on the morning of July 14, 2005. After taking a Greyhound bus to Toledo, appellant went to a Subway restaurant in the Central Avenue and McCord Road area, where he saw the victim. After approaching the victim and talking with her, appellant stated that he gave her the phone number for his parent's house on Dorr Street, which she programmed into her cell phone. Appellant testified that later that evening he received a phone call from the victim which lasted one to two hours. On July 16, 2005, appellant claimed to receive another call from the victim around noon. Appellant testified that they arranged to meet up in the area of Yates Street and Central Avenue, which occurred around 2:30 p.m. Appellant stated that he and the victim drove to Baskin Robbins and then she returned him to the Yates area.
 {¶ 31} Appellant testified that he did not see the victim again until July 18, 2005. According to appellant, the victim called him around noon, he suggested that they rent *Page 12 
videos, and he had the victim pick him up and take him to Family Video on the corner of King Road and Bancroft Street. After renting videos, appellant stated that the victim dropped him back at his house and said she would return later that day. Appellant testified that the victim picked him up at his residence around 3:00 p.m. and took him to her house, where she proceeded to sit in his lap and kiss him. Appellant testified that they were kissing, disrobed down to their underwear, and that the victim was rubbing his penis between her legs. Appellant stated to the victim that they needed a condom, but that he did not have one. According to appellant, the victim stated that she had one in her purse. When she went to get it, her purse fell open on the floor, whereupon appellant saw her driver's license which indicated that she was only 16 years-old. Appellant testified that he thought the victim was a 19 year-old college student. When he discovered her age, appellant testified that he got dressed to leave, the victim begged him to stay, but he left and walked home through the woods. Appellant testified that he was at the victim's home between 3:00 p.m. and "no later than 4:20."
 {¶ 32} On rebuttal, Deputy Sheriff Justin Hayden, who worked in the Lucas County jail, testified that a couple of months before trial, while appellant was in jail, he had asked Hayden some questions about evidence collection. Hayden described the conversation as follows:
 {¶ 33} "That's how the conversation had started, if they were able to lift prints off of the bike. I told him I'm not an evidence tech or what have you, that I haven't been *Page 13 
trained at the academy and everything else. It seemed reasonable to me they could lift prints off of a bike. * * *
 {¶ 34} "From that point on [the conversation] did continue. He had gone into stating that they were either getting ready to take a blood sample from him or they had already taken a blood sample from him, but that he wasn't worried about the results of that blood sample. He knew it was for DNA reasons. * * *
 {¶ 35} "He said he wasn't worried about them taking his blood, because he knew that he hadn't left any type of evidence at the crime scene that they had accused him of, that he wasn't even there. He had been at his girlfriend's house the morning that the police were stating he was at wherever the victim — wherever this crime had taken place, that he was at his girlfriend's house. * * *
 {¶ 36} "He said that while he was at — while he was at his girlfriend's house when this crime was taking place, he was — you want me to use the exact words? He stated that he was at his girlfriend's house [f**king] her at the time that the police were saying that he was at this crime scene. * * *
 {¶ 37} "He had gone on to say that, you know, he couldn't have left any evidence at the crime scene because he wasn't at the crime scene. He was at his girlfriend's house, that he doesn't — he wasn't mad at the girl, but he doesn't know the girl, wasn't mad at the girl for, I guess, identifying him or something, but that, you know, he didn't know the girl." *Page 14 
 {¶ 38} Hayden testified that he had not made a report of the conversation because it was not unusual for the inmates to talk to him about their cases and there was nothing unusual about what appellant said to him. Hayden, however, stated that during the evening news, after the first day of appellant's trial, he heard that appellant was going to claim that the sexual contact with the victim was consensual. Because that was not what appellant had told Hayden in jail, Hayden came forward and was able to get in contact with the prosecutor's office the following morning, the second day of trial, before appellant testified.
 {¶ 39} After viewing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crimes of rape and kidnapping. Appellant, however, additionally argues that the convictions were against the manifest weight of the evidence because "there was little evidence to support [the victim's] claim of kidnapping and forced sex," the neighbor was outside "at the same time [the victim] claimed to have been abducted, yet she saw no abduction," and although the victim claimed to be taken to a wooded area only two minutes from her home, she was unable to identify the scene of the crime. Upon review of the entire record, we find that the jury could reasonably conclude from the evidence presented that the state proved the offenses of rape and kidnapping beyond a reasonable doubt. We further find that the trier of fact did not clearly lose its way or create a manifest miscarriage of justice. Accordingly, we find appellant's first assignment of error not well-taken. *Page 15 
 {¶ 40} Appellant argues in his second assignment of error that, because the trial court engaged in judicial fact-finding in imposing a non-minimum, consecutive term of incarceration, his sentence must be vacated pursuant to State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, and Blakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531. Appellant further argues that the remedy in Foster cannot be applied to persons who committed their crimes prior to the release ofFoster, because such an application would violate principles of ex post facto and due process. As such, appellant asserts that his sentence should be vacated and that he should be remanded to the trial court for resentencing to a minimum, concurrent term of imprisonment.
 {¶ 41} Appellant's sentence to seven maximum, consecutive terms of incarceration is voidable pursuant to Blakely and Foster. State v.Payne, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 29. However, inPayne, the Supreme Court of Ohio held that "a lack of an objection in the trial court forfeits the Blakely issue for purposes of appeal when the sentencing occurred after the announcement of Blakely." Id., ¶ 31. Where an appellant has forfeited his right to raise aFoster/Blakely issue on appeal, an appellate court is confined to a plain error analysis. Id., ¶ 24; State v. Baccus, 6th Dist. No. L-06-1310, 2007-Ohio-5991, ¶ 13.
 {¶ 42} Although appellant's indictment, trial and sentencing occurred after Blakely, he failed to object to the constitutionality of his sentence in the trial court. Pursuant to Payne, we find that appellant forfeited the Blakely issue on appeal. We further find that *Page 16 
no plain error occurred in this case because appellant cannot establish that but for the Blakely error, he would have received a more lenient sentence. Payne, ¶ 25.
 {¶ 43} As noted by the Ohio Supreme Court, if a defendant was to be resentenced pursuant to Foster, nothing would prohibit "the trial court from considering the same factors it previously had been required to consider and imposing the same sentence or even a more stringent one." Id., ¶ 26. In this case, the sentence imposed was within statutory parameters. The trial court considered factors, including, but not limited to, the seriousness of the crime, likelihood of recidivism, the circumstances of the crime, and appellant's criminal history. Upon review, we find that appellant failed to establish that he was prejudiced by the judicial fact-finding requirements, or that, but for the error, he would have received a more lenient sentence. Appellant's second assignment of error is therefore found not well-taken.
 {¶ 44} Appellant argues in his third assignment of error that he was deprived the effective assistance of trial counsel in three respects: (1) trial counsel failed to make a Batson v. Kentucky (1986),476 U.S. 79, challenge when the state removed the first minority juror; (2) trial counsel failed to object to a surprise rebuttal witness and a discovery violation; and (3) trial counsel failed to request a curative instruction regarding inappropriate comments by the state during closing arguments.
 {¶ 45} In Ohio, a properly licensed attorney is presumed competent and the burden is on the appellant to show counsel's ineffectiveness.State v. Lytle (1976), 48 Ohio St.2d 391; State v. Hamblin (1988),37 Ohio St.3d 153. The United States Supreme Court, in *Page 17 Strickland v. Washington (1984), 466 U.S. 668, 686, set forth a two-part test for reviewing claims of ineffectiveness:
 {¶ 46} "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."
 {¶ 47} The United States Supreme Court held that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." Id. Specifically, to establish ineffectiveness, appellant must show that, but for counsel's deficient performance, there is a reasonable probability the result of the trial would have been different. Id.
 {¶ 48} Appellant argues that he was denied the effective assistance of trial counsel due to counsel's failure to raise a Batson v.Kentucky (1986), 476 U.S. 79, challenge when the state removed the first minority juror. During voir dire, the state used its first and third peremptory challenges to dismiss minority jurors, Juror No. 14 and Juror No. 13, respectively. After the state's dismissal of the second minority juror, trial counsel objected on the basis of Batson, arguing that "a pattern has developed now between juror number 14 and now number 13, and I would just leave it at that, Judge." The trial court *Page 18 
asked the state to provide a neutral explanation as to why Juror No. 13 was being excused. The prosecutor stated the following:
 {¶ 49} "If the court recalls, this prospective juror is a minister. We talked extensively about her ministries, that she helps people, for the lack of a better term, get started again, turn things around, has dealt — I don't specifically remember her response, but dealt with prior felons before. Just feel there may be more of a helping aspect to her thought process as opposed to objective fact finding, which is what a juror is needed for."
 {¶ 50} The trial court denied the Batson challenge, finding that the state gave "a neutrally based reason that is legitimate from the state's perspective for excusing this juror." Even though no objection had been made as to Juror No. 14, the state's first peremptory challenge, the trial court stated:
 {¶ 51} "Should put on the record that juror number 14 is African-American. There was no similar challenge to juror number 14 when excused by the state. The record would reflect that juror number 14 indicated two things. One, had read something or heard something this morning on the news, had read it in the paper, and her brother-in-law is a registered sex offender."
 {¶ 52} The state agreed with the trial court's statements regarding Juror No. 14, and stated, "I was going to make that point as well. Thank you."
 {¶ 53} The United States Supreme Court has held that the Equal Protection Clause forbids a prosecutor from challenging a prospective juror solely on the basis of his or her race based on the belief that the juror could not be impartial when the defendant is *Page 19 
African-American. Batson, 476 U.S. at 89. Batson has established a three-part test to determine whether a prosecutor's use of a peremptory challenge is racially motivated. First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge against a member of a cognizable racial group under circumstances that give rise to an inference that the exclusion was based on race. Id. at 96, as modified by Powers v. Ohio (1991), 499 U.S. 400, 412-413.
 {¶ 54} Second, the state must prove a race-neutral explanation for the challenge. Batson at 98. The explanation need not rise to the level of a challenge for cause, State v. Bryant (1995), 104 Ohio App.3d 512, 517, or even be "minimally persuasive" or a plausible basis that the juror will be unable to perform his or her duties. Id. at fn. 1, citingPurkett v. Elem. (1995), 514 U.S. 765, 767. It is only when "implausible or fantastic * * * silly or superstitious" reasons are employed as pretexts for purposeful discrimination that the Constitution is offended. Purkett at 768. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York (1991), 500 U.S. 352, 360.
 {¶ 55} Third, the trial court must determine whether the defendant has proven purposeful discrimination. Batson at 98. Because a trial court's findings in a Batson analysis result from an evaluation of credibility, the findings are entitled to great deference. Id. at 98, fn. 21. A trial court's findings in a Batson analysis will not be disturbed unless clearly erroneous. State v. White (1999), 85 Ohio St.3d 433, 437;Bryant at 517; and Hernandez at 364-365. *Page 20 
 {¶ 56} In this case, appellant is African-American and the victim is Caucasian. Defense counsel suggested after the second peremptory challenge of an African-American juror that a pattern had emerged of dismissing jurors on the basis of race. The trial court found there was a sufficient basis to shift the burden to the state to prove a race-neutral explanation for the challenges. The state offered race neutral explanations for each peremptory challenge used on African-American jurors. We find no indication that the trial court was clearly erroneous in determining that there was no demonstration of purposeful discrimination.
 {¶ 57} Upon review, we find that appellant failed to establish that trial counsel was deficient for failing to object to the state's first peremptory challenge of an African-American juror. Defense counsel's argument pursuant to Batson was that a "pattern" of racially motivated challenges had occurred. However, until the second minority juror had been dismissed, no "pattern" could have emerged. Even if defense counsel should have made an earlier objection, we find that appellant failed to establish any prejudice from this alleged deficiency in representation. Race-neutral explanations were provided for each dismissed juror, the matter was fully considered by the trial court, and the assertedBatson violation was denied.
 {¶ 58} Appellant next argues that he was denied the effective assistance of trial counsel due to counsel's failure to object to the state calling an undisclosed, surprise rebuttal witness. The Ohio Supreme Court has held that "[t]he criterion for determining whether the state should have provided the name of a witness called for rebuttal is *Page 21 
whether the state reasonably should have anticipated that it was likely to call the witness, whether during its case in chief or in rebuttal."State v. Lorraine (1993), 66 Ohio St.3d 414, 423, citing State v.Howard (1978), 56 Ohio St.2d 328, 333. The prosecutor has no duty to provide names of witnesses that he reasonably did not anticipate would testify until testimony was presented by the defendant which was properly rebutted. Id.
 {¶ 59} In this case, the position of the defense was that all sexual activity between appellant and the alleged victim was consensual. The victim, however, denied knowing or having any contact with appellant prior to the assault. During the evening news, the day before appellant was to testify in his own defense, Deputy Hayden heard that appellant would assert that any sexual contact with the victim was consensual. Hayden, however, recalled a conversation with appellant while he was being held in the Lucas County jail, wherein appellant indicated that there would be no DNA evidence connecting appellant to the crime because he did not know the victim and he was not at the scene of the crime. Hayden contacted the Sylvania Township dispatch and eventually spoke with the detective in charge of appellant's case. Hayden met with the prosecutor in the morning on the second day of trial. Three more witnesses for the state testified and then the state rested. Appellant's testimony was the only evidence presented on behalf of the defense. Thereafter, the state called Hayden as a rebuttal witness. The following colloquy occurred:
 {¶ 60} "[DEFENSE COUNSEL]: It's evidence I wasn't aware of.
 {¶ 61} "THE COURT: Well — *Page 22 
 {¶ 62} "[DEFENSE COUNSEL]: I'm going to object to its introduction.
 {¶ 63} "THE COURT: It's my understanding from what he just said, and this is somebody who just called him today, but nevertheless, they are required to give you discovery of matters in their case in chief, okay. So you're not objecting?
 {¶ 64} "[DEFENSE COUNSEL]: Well —
 {¶ 65} "[PROSECUTOR]: Rebuttal witness as well.
 {¶ 66} "[DEFENSE COUNSEL]: When did you find out?
 {¶ 67} "[PROSECUTOR]: Found out this morning, but I couldn't give you the information with respect to — if I could finish. Couldn't give you any information with respect to the witness's possible testimony because I didn't know what the defendant would testify to on his direct examination, so I had to wait and see what he testified to before I could call rebuttal witness.
 {¶ 68} "THE COURT: Object?
 {¶ 69} "[DEFENSE COUNSEL]: No."
 {¶ 70} Based on the foregoing, it is clear that defense counsel was aware of the potential issue, but declined to object to the presentation of the rebuttal witness. Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel.State v. Phillips (1995), 74 Ohio St.3d 72, 85. Additionally, reviewing courts must not use hindsight to second-guess trial strategy, and must keep in mind that different trial counsel will often defend the same case in different manners. Strickland, supra at 689; State v.Keenan (1998), 81 Ohio St.3d 133, 152. *Page 23 
 {¶ 71} Even if defense counsel's representation was deficient in failing to object to Hayden's testimony, we find that appellant failed to establish that he was prejudiced by this alleged deficiency. Crim.R. 16(E)(3) states that the remedy for failing to comply with discovery may include the court ordering the "party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." In this case, it is not clear that the trial court would have prohibited Hayden's testimony had counsel objected to its introduction. There was no showing that the prosecutor's failure to disclose Hayden to the defense was a willful violation of Crim.R. 16, because Hayden was only discovered by the state the morning before appellant testified. See State v. Parson (1983),6 Ohio St.3d 442, syllabus. Also, the relevance of Hayden's testimony could not be known until after appellant testified. See State v.Finnerty (1989), 45 Ohio St.3d 104, 108. And, finally, appellant had foreknowledge, and should not have been surprised by Hayden's testimony, because it concerned a statement allegedly made by appellant. Id. Thus, we find that appellant failed to establish ineffective assistance of trial counsel in this regard.
 {¶ 72} Appellant further argues that he was denied the effective assistance of trial counsel when no curative instruction was requested regarding an inappropriate comment made by the state during closing arguments. In particular, the prosecutor stated: *Page 24 
 {¶ 73} "The burden is on the State of Ohio. We're not shifting the burden, but ask yourself this. Where is Carolyn? Where are these phone records? There is absolutely no burden shifting, but think about that."
 {¶ 74} Defense counsel objected to this statement. The trial court sustained the objection and ordered the jury to disregard the prosecutor's statement. The trial court later properly instructed the jury regarding the burden of proof and that "evidence" does not include closing arguments of counsel.
 {¶ 75} We find that appellant has not demonstrated that defense counsel's representation was deficient. Counsel objected to the prosecutor's statements, the objection was sustained and the jury was ordered to disregard the statements. Additionally, it is presumed that the jury will follow the court's instructions when deliberating.State v. Loza (1994), 71 Ohio St.3d 61, 75. Because the jury was told to disregard the statements, we find that appellant failed to demonstrate that the prosecutor's statements prejudicially affected his right to a fair trial.
 {¶ 76} Based on the foregoing, we find that appellant failed to establish that his trial counsel's representation was deficient or that he was prejudiced by any alleged deficiency. Appellant's third assignment of error is therefore found not well-taken.
 {¶ 77} Appellant argues in his fourth assignment of error that he was denied a fair trial due to prosecutorial misconduct. Specifically, appellant argues that the state attempted to shift the burden to appellant by suggesting to the jury during closing arguments that appellant failed to present evidence in support of his testimony and that *Page 25 
the state failed to disclose Deputy Hayden as soon as his existence as a potential witness became known to the state.
 {¶ 78} As discussed with respect to appellant's third assignment of error, the prosecutor's statements regarding appellant's failure to provide evidence in support of his testimony was stricken and the jury was instructed to disregard it. Accordingly, we find that appellant failed to establish any prejudice in this regard.
 {¶ 79} Also, as discussed above, we have already found that the state disclosed Deputy Hayden at the first opportunity the state knew his testimony could be used in rebuttal, which was after appellant testified. Even if earlier disclosure was possible, appellant fails to establish prejudice. Since Hayden testified to statements allegedly made by appellant, appellant would have known of Hayden's testimony and could have prepared his defense accordingly. Appellant's fourth assignment of error is therefore found not well-taken.
 {¶ 80} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 26 
PETER M. HANDWORK, J., ARLENE SINGER, J., WILLIAM J. SKOW, J., CONCUR.
[1] The judgment entry of sentencing was journalized on December 12, 2005.
[2] R.C. 2907.01(C) defines sexual activity as "sexual conduct" or "sexual contact," or both. "`Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). "`Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C.2907.01(B).
[3] The bicycle had been found next to the victim's house. *Page 1